### FIRST NATIONAL BANK OF CISCO v. AARON WOOD ET AL.
#### No. 1421.

1. Accommodation Note—Misappropriation—Indorsement.—An accomodation note made payable to a bank was signed by the makers on the understanding that it was to be deposited in the bank to secure a loan for the purchase of wheat for a mill, the proceeds of which, when ground, were to be applied to paying off a mortgage on the mill. The makers, without notice to the bank of any restrictions on the disposition of the note, allowed the manager of the mill for whose benefit it was made to have possession and control of the note, and he procured the bank to indorse the note, and applied it directly in satisfaction of the mortgage. *Held*, that a judgment in favor of the makers of the note over against the bank was not warranted, and that the bank, having acted in good faith, could not be held liable for such indorsement.

2. Same—Misappropriation of Note.—In the absence of a fraudulent misappropriation of accommodation paper, the person giving the accommodation must show that he has been injured by the misappropriation, and where the note has effected the substantial purpose for which it is designed by the parties, he can not object that it was not effected in the precise manner contemplated at the time the note was made.

APPEAL from Eastland. Tried below before Hon. T. H. CONNER.

This action was brought by C. H. Edwards against Wood and others, as makers of the note sued on, and the Farmers' Alliance Co-operative Milling Company, as indorser. The Milling Company made default, and the other defendants, makers of the note, by special plea, made the First National Bank of Cisco and W. N. Porter, indorsers, also defendants in the case, alleging that the note was made payable to the bank in order that the bank might advance the money thereon to the milling company, with which such company should buy wheat, grind the same, and continue running, and that the bank, instead of paying to the milling company the money or cash for the note, indorsed the note without recourse, and delivered it to the milling company, and thereby wrongfully put it into circulation; and they asked judgment against the bank for such sums of money as they might be held to pay plaintiff Edwards.

The first assignment of error by the bank is, in effect, that the court erred in concluding, as matter of law, that the assignment of the note

by the bank was an unauthorized appropriation of the note for which the bank should be liable to the makers for the amount they might have to pay thereon; because the note was made as a loan or gift to the milling company, as an accommodation note for the purpose of relieving such company from financial embarrassment, and the bank was not expected to pay the makers anything for the note, but the milling company was to receive from the bank the value of the note, which it did, in the note itself, and used the note in lieu of cash as it saw fit to do, at its face value, in discharging its mortgage liability, and the bank received nothing.

*J. H. Calhoun,* for appellant.—1. The property in a promissory note or chose in action may pass by delivery in case of either gift or transfer, and a written assignment is not essential where the chose in action or note is delivered; and the note sued on in this case was made and delivered as a loan or gift to the milling company, and became the property of the milling company before it was indorsed by the defendant bank. 3 Pom. Eq. Jur., sec. 1148; 3 Wait's Act. and Def., 491; 8 Am. and Eng. Encyc. of Law, p. 1322, sec. 7.

2. Where a negotiable note is intentionally executed without consideration for the benefit of any party to be used as a basis of credit or for other purposes, it is an accommodation note, and persons handling the same in good faith, not knowing the private agreements between the makers and the beneficiary, are protected. Story on Prom. Notes, sec. 194; Benjamin's Chalmers' Dig. of Bills and Notes, art. 90.

3. The object of an accommodation note is to enable the beneficiary or party to be accommodated to use the same to his credit; and a party who acts in good faith and does nothing calculated to defeat that right, is not liable to the makers of said note. Story on Prom. Notes, sec. 194; Benjamin's Chalmers' Dig., art. 90.

4. The appellant bank having no interest in the transaction, and having made no contract with or promise to the makers of the note, its liability and position is not more serious than that of "a bailee without reward," and such bailee would be liable only for gross negligence or bad faith. Schoul. on Bailm., 2 ed., sec. 15, pp. 42–45, 48; 2 Kent Com., 8 ed., *569; Foster v. Bank, 17 Mass., 479; Bank v. Schley, 58 Ga., 369; Scott v. Bank (Ky.), 10 Bush, 344.

5. Where there was no material diversion of the note from the purpose for which it was originally executed, the makers of the note can not complain. Rand. on Com. Paper, secs. 1803, 1804; Dan. on Neg. Inst., 4 ed., secs. 792, 793; Bank v. Casey, 1 Hill (N. Y.), 513.

*L. W. Campbell,* for appellees.—1. Had said note been merely delivered back by the bank to the milling company, without its indorsement thereon and transfer of same, the milling company could not have sold it and placed the title thereof in either Porter or the plaintiff Edwards, so as to entitle them or either of them to maintain the

position of innocent purchaser, for they would only have the equitable title and not the legal title to the note.    Bank v. Bingham, 16 Am. St. Rep., 765; Blum v. Loggins, 53 Texas, 121; 2 Am. and Eng. Encyc. of Law, 390, and cases cited in notes 7, 8; Rev. Stats., art. 265.

2.    Where it is shown that a note is made for accommodation and without consideration, persons dealing with said note should see that they do not violate the terms and conditions upon which the note was given, or else the makers will be released; and if an act is done which would amount to the release of the accommodation makers, and the note is afterwards or at the same time transferred to an innocent purchaser, or its form is so changed that it might be transferred to an innocent purchaser, and is afterwards actually so transferred, all persons dealing in or whose acts contribute towards said transfer are responsible to the makers of said note for its conversion, if they are afterwards required to pay it to such innocent purchaser.    Cool. on Torts, 447.

A court of equity would have restrained the bank from making the transfer upon application of appellees.    High on Injunc., secs. 710–712.

3.    The bank did convert the note sued on and unlawfully put same in circulation.    It was the plain duty of the bank to have either returned the note to the milling company, from whom the bank received it, without material change of the form of the note, or to have paid the money on the note to the milling company.    The defendants were looking to the bank to advance money on the note, because they believed that by so doing it would be a beneficial act to the milling company.    The defendants were accommodation makers.    They had a right to stand on the very letter of their contract.

4.    The object of a maker in putting his name to an accommodation note is to enable the beneficiary or payee of the note to do with it as desired by the maker, and if he makes it for one purpose it can not be used for another.    He has a right to stand on the letter of his agreement.    The bank was notified that these people received no consideration for signing this note.    That was sufficient notice to the bank that they must not place these people in a worse condition than they otherwise would be if money was advanced on said note or divert it from the purposes for which it was given, whether to the injury of the makers or not.    Smith v. Montgomery, 3 Texas, 199.

5.    If the bank occupied the position of "a mere bailee without reward," it should have returned the bailment in identically the same condition as when received, as we do not understand that a bailee has a right to sell the property placed in his custody or to dispose of it without the consent of the owner, and if he does any act which amounts to a misfeasance, he is clearly responsible.    2 Kent Com., *569, 570.

STEPHENS, ASSOCIATE JUSTICE.—We approve, though perhaps not in all respects as favorable to appellant as the evidence warranted, the trial court's conclusions of fact, finding in substance, that on the

15th day of April, 1887, W. N. Porter sold to the Farmers' Alliance Co-operative Milling Company (a corporation) the Cisco Roller Mills, for $12,000, secured by twelve notes of $1000 each, one-half payable in six months, and the balance in eighteen months after date of sale, taking a trust deed to secure their payment on the mill property. In October, 1889, these notes being all past due and unpaid, he was about to foreclose the deed of trust, whereupon the directors of the mill company after much deliberation finally concluded, as a means of preventing this sale and providing for this indebtedness, to make an effort to purchase all the wheat necessary to meet the capacity of the mill, and to pay out of the proceeds arising from thus operating it, the six notes first maturing, if sufficient for that purpose, the balance to be covered by good personal notes of the milling corporation and others; Porter agreeing at the time to accept the flour, etc., of the mill at its cash price, and if not a sufficiency, to accept good personal notes for the balance, stipulating that the notes should be such as the First National Bank of Cisco, by its cashier, should approve as good; agreeing also to extend for twelve months the other six notes. He suggested, also, that the notes be made payable to said bank, in order that its cashier might pass on the solvency of the makers.

In order to carry out this undertaking, the board of directors appointed solicitors, of whom Thomas McLachlin, the manager of the mill company, was one, who proceeded, in the discharge of the duty imposed on them, to visit the several alliances in Eastland and neighboring counties, to secure the notes to provide for the indebtedness in the manner stated. McLachlin visited the neighborhood of the signers of the note sued on in this case, and represented at a meeting of the alliance the condition of the mill, the necessity of the payment of one-half the Porter debt, the profits likely to accrue from the wheat venture, that Porter had agreed to take flour and notes, affirming that he knew that out of the profits to be so derived the payment demanded could be made, but if they should prove insufficient, that the balance could and would be paid in individual notes, beseeching the members to join in and procure good notes which would be acceptable to the bank at Cisco, and upon which the milling company could procure the money with which to buy wheat, stating that the bank had promised to loan as much as $2000 on good notes, assuring them that he felt sure that none of the makers would ever have a dime to pay on them, but in case they did, that the mill company would issue paid up stock in the milling company equal to the amount so paid.

The note sued on in this case was made by the defendant signers as a result of said meeting and speech, all the makers, save the defendant Tate, being stockholders in the mill company. The defendants I. P. Mitchell, H. Dennis, and H. C. Tate, however, were not present, but were induced to sign it by some of the brethren who took it to them at the time they signed. The general condition of the mill was known to them, that is, that Porter's debt must be paid, but it was

represented to them, and they each expressly understood, that the note was to be given to the bank for money, and the money used alone in buying wheat, the representations as to the profits being such that they severally believed the profits arising from the wheat to be purchased would be sufficient to pay Porter's first six notes. Neither of these three defendants knew that McLachlin would handle the note, or that he would have anything to do with the note. They supposed the note would be deposited in the bank, and the mill company thereon get the money with which to buy wheat, and knew McLachlin was the manager. They had no knowledge of any purport to trade the note to Porter; in fact it was not then contemplated. Neither of these defendants received any consideration for the signing, they and each of them being purely accommodation makers.

After the signatures of the defendants Mitchell, Dennis, and Tate, the note sued on, by one of the other makers, was given to said mill manager McLachlin, who several weeks thereafter took several thousand dollars' worth of notes, including the one sued on, to the defendant bank, and endeavored thereon to procure the promised money with which to buy wheat. The cashier refused to take the notes or advance money thereon, on the ground that the notes were made payable to the bank, and no consideration whatever had proceeded from the bank to the makers, a fact of which the bank had full notice. McLachlin thereupon caused a meeting of the board of directors of the mill company to be called, and it was at such meeting finally decided to use the notes in direct payment to Porter. Thereupon McLachlin took the notes to the bank for the purpose of having the bank pass on the solvency of the makers. The cashier pronounced several—the one sued on, among others—good, and McLachlin then urged the cashier to indorse the notes to the mill company, inasmuch as they were made payable to the bank. The cashier at first refused to do so, but finally, being assured by McLachlin that the notes were intended to pay Porter, and that Porter had agreed to accept them as such, on to wit, the 8th day of December, 1889, signed and indorsed without recourse the note sued on to the mill company, and the mill company, on or about the same date, and before maturity of the note, signed and indorsed the note sued on to Porter.

Defendant Porter, in consideration of the notes and some flour, etc., then delivered to him, surrendered his first six notes and released his trust deed, in so far as it secured the payment of his first six notes, and extended the time on the balance. Defendant Porter, at the time he received the note sued on, had no notice that the note was made for any special purpose, or of any defense thereto of any kind. The evidence, however, authorized the inference, and the court finds, that all of the signers of the note sued on, except said defendants Mitchell, Tate, and Dennis, either directly or indirectly authorized and directed McLachlin to induce the indorsement of the bank to the mill company, and from the mill company to Porter, but as to defendants last named,

the court finds that after the signing of the notes by them, they, nor either of them, were cognizant of said proceedings until after the note had been presented for payment in behalf of the plaintiff in this suit; nor did they in any manner authorize any person to apply the note sued on, or the proceeds thereof, for any purpose other than to purchase wheat. Defendant Porter afterwards, in due course of trade, for value and before maturity, transferred and assigned, by indorsement and delivery, the note sued on herein to plaintiff C. H. Edwards.

*Conclusions of Law.*—The court rendered judgment in favor of Edwards, as holder for value in due course of trade, upon the note sued on, against all the makers, and also rendered judgment over against appellant bank in favor of the three makers above named in the sums so adjudged against them. To this part of the judgment appellant bank assigns error, and that assignment, we think, must be sustained.

While these three makers of the note contemplated that it would be used by the mill company to raise money to buy wheat with, they were also aware that the ultimate purpose of the accommodation was to pay off the Porter debt and save the mill, and with this in view they signed and permitted the note to pass into the hands of the manager of the mill company, without giving the bank any notice of the restricted manner in which they understood it was to be used. They thus placed it in the power of the party to be accommodated to exercise a discretion and to vary the manner of its use. The promise which they expressed in writing was to pay to whom the bank might order the amount of the note, without placing any restrictions upon the power of the bank, and without bringing to it any notice except of the fact that this promise was made for the accommodation of the party holding it.

The maxim, that he who trusts most shall lose most, would seem to have application. It has been characterized as an accurate statement of the law, that "where a note has effected the substantial purpose for which it was designed by the parties, an accommodation indorser can not object that it was not effected in the precise manner contemplated at the time of its creation." There seems also to be authority for the proposition that, in the absence of a fraudulent misappropriation of accommodation paper, the person giving the accommodation must show that he has been injured by the misappropriation, and that the mere fact that the note was intended to be discounted at a particular bank does not prevent the party for whose benefit it was given from making other use of it.

It is manifest from this record that all parties acted in good faith, and that, in assigning the note to Porter in satisfaction pro tanto of his debt, the substantial purpose of the accommodation was to that extent effected; and it is not made to appear that the makers of the note, or even the mill company, would have been in any better condition had

it been negotiated at the bank and the proceeds appropriated to the purchase of wheat.

It will be borne in mind that the cashier of the bank, in passing on the solvency of the makers and indorsing the note without recourse, was also doing, under circumstances evincing no gross negligence, an act of accommodation, for which it would seem the bank ought not to be held liable in the absence of a showing that injury resulted therefrom to some one having a right to insist that the bank was under obligation to withhold such indorsement, or at least to act in respect thereto with ordinary care.

As tending to support these views, see 2 Pars. on Notes and Bills, p. 28, note k; 3 Randolph Com. P., secs. 1803, 1804; 1 Dan. on Neg. Inst., secs. 392, 792, 793; 2 Kent, *p. 571; Morris v. Morton, 14 Neb., 358; Cross v. Rowe, 22 N. H. (2 Foster), 77; Dawson v. Goodyear, 43 Conn., 548; 1 Randolph Com. P., sec. 370.

Upon no view of the case can we sustain the judgment against the bank; it will therefore be reversed, and here rendered in its favor.

*Reversed and rendered.*

Delivered November 7, 1894.